IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MICHIGAN

WILLIAM KELLY,                        )
                                      )
            PLAINTIFF,                )        CIVIL ACTION NO. _____-CV-_____
                                      )
    vs.                               )
                                      )        HON.
GRAPHIC PACKAGING                     )
CORPORATION,                          )
                                      )
            DEFENDANT.                )
_____)

## COMPLAINT

PLAINTIFF, WILLIAM KELLY, by and through her attorneys, CARLA D. AIKENS, P.L.C., submit the following Complaint against DEFENDANT GRAPHIC PACKAGING CORPORATION ("Graphic Packaging").

## JURY DEMAND

COMES NOW PLAINTFF, WILLIAM KELLY, and hereby makes his demand for trial by jury.

## JURISDICTION

1.      At all times relevant to this complaint, Plaintiff William Kelly was a resident of Kalamazoo County in the State of Michigan.

2.      Defendant Graphic Packaging is a foreign for-profit corporation with a continuous and systematic place of business in Kalamazoo County at 1500 N Pitcher St, Kalamazoo, MI 49007.

3.      This action is brought in this Court on the basis of federal question jurisdiction, pursuant to Title VII of the Civil Rights Act of 1964, 42 USC 2000e et seq.

4.      Pursuant to 28 U.S.C. §1367, this Court has supplemental jurisdiction over Plaintiffs'

state law claims.

## VENUE

5.      Venue is proper in the Western District of Michigan pursuant to Section 706(f)(3) of Title VII, 42 U.S.C. § 2000e-5(f)(3), because the unlawful employment discrimination giving rise to Plaintiffs' claims occurred in this District.

## STATEMENT OF FACTS

6.      Plaintiff is an African-American male who was hired by Defendant as a mill utility worker on November 5, 2014.

7.      Plaintiff was successful at his job; Plaintiff received no formal reprimands by his employer and received compensation and title promotions throughout the entire term of his employment.

8.      Almost immediately upon starting with Defendant, Plaintiff was intentionally skipped for overtime by Defendant's supervisors, violating the overtime rules of the company.

9.      When Plaintiff complained about being skipped, he was verbally berated and cursed at by Defendant's supervisor, and he was told by his union representative that Defendant skips overtime for African-American employees.

10.      Despite complaining to Defendant about this conduct, nothing was done about what happened to Plaintiff nor was anyone disciplined.

11.      Following this incident, the work colleagues and co-workers of the supervisors began treating Plaintiff differently and consistently mistreated him, but as Plaintiff was still a new hire when this conduct first began, he endured the mistreatment in the hope of keeping his job.

12.      Further, during the period that Plaintiff, who is African-American, worked for Defendant, he became aware that, although Defendant had a penchant for hiring African-American workers,

they were also systematically and disproportionately terminated for minor reasons, even though non-African-American employees engaged in the same or worse conduct and were not terminated.

13.     Upon information and belief, at least part of the reason that Defendant did not bring Plaintiff back to work is because he is African-American, as he is aware of other workers who were not African-American who were accommodated at Defendant's workplace.

14.     In one incident, Plaintiff was told to clean the restroom by a Caucasian female employee who yelled and cursed at him that it needed to be done or she would tell management.

15.     When Plaintiff informed her that he was busy with work he had been given by his supervisor and tried to walk away, the female employee shouted "Don't you walk away from me!" and shoved him with two hands in the chest.

16.     Because of the prior issues Plaintiff had had, Plaintiff again endured the treatment and did not say anything, but his supervisor approached him about the situation as if he had done something wrong.

17.     Plaintiff told he managers and Superintendent about the incident and had them pull the video of the incident showing his assault, and they all watched together on the video which showed the employee shoving Plaintiff.

18.     Plaintiff was informed that the incident would be handled but, upon information and belief, the only thing that happened to the female employee was that she was given the weekend off, unpaid.

19.     When other co-workers found out about the incident, the hostility towards him only increased; some co-workers defended him, stating that if the roles had been reversed, he would

have been terminated and possibly charged with criminal assault for putting his hands on a Caucasian woman.

20.     After the tension in his department began to mount, Plaintiff was transferred to his union representative's department because the latter grew tired of the manner in which Plaintiff was being mistreated in his prior department.

21.     In 2016, Plaintiff broke his ankle outside of work and missed work with surgeries and rehabilitation.

22.     When he returned, he was placed in a new department that required him to be on his feet constantly and more often than in the position he had prior to leaving.

23.     Plaintiff believed this conduct was intentional, because he had been warned by co-workers that management targets people returning to work from injuries, and he had already had issues with management prior to becoming injured.

24.     Although Plaintiff's seniority remained the same while he was on leave, after returning from work on medical leave, he was skipped multiple times on bids for overtime; thus, Caucasian employees who were hired after Plaintiff were working jobs and getting paid more than Plaintiff, against company policy.

25.     Because Plaintiff worked the lesser jobs, it required far more physical activity as well as decreased pay from what he was entitled to based on the bid system that was supposed to be in place.

26.     Despite complaints to the union and to HR, nothing was done, and Defendant continued to keep him in lower paying jobs, working harder than he should have had to work given his medical condition.

27. During this time, out of approximately 40 people, all 5 of the African-American employees within Plaintiff's job classification were all moved to the department under the same supervisor, who was known to have racist tendencies and who systematically wrote up and most were eventually terminated.

28. In about October of 2016, Plaintiff had an incident at work where a supervisor told him to sit on a pole and dig his feet into the floorboards to keep his balance. However, as soon as he did this and without warning, the supervisor turned on the machine, which threw Plaintiff into a guardrail and allowed a shaft to grind against his legs and ankle.  The guardrail was the only reason Plaintiff did not fall into the other parts of the machine which could have fatally injured him.

29. Other co-workers yelled at the supervisor who caused Plaintiff to become injured, telling him to turn off the machine.

30. While Plaintiff tried to stand, the shaft grinded into the metal plate in his ankle, causing severe pain and immediate swelling.

31. Plaintiff was told to sit in the breakroom with ice while they figured out what to do.

32. The supervisor who injured Plaintiff was more concerned with getting the machine up and running than Plaintiff's condition, and as a result, Plaintiff was left in the breakroom for nearly three hours, without medical attention.

33. After approximately three hours, the supervisor came in to write the incident report and told him that he had to wait until the next day to see a doctor.

34. Plaintiff was not allowed to leave, as he would have been considered walking off the job, so he was forced to wait until the incident report was written by his supervisor who had injured him.

35.     Further, in an apparent effort to avoid having to report the incident to OSHA, Defendant's "safety captain," "Jennifer," accompanied Plaintiff the following day to urgent care, Plaintiff was required to report to work in his steel-toe boots and sit in the breakroom so that he could still appear as if he was working.

36.     Although turning on a machine and not securing the area violates the 7 "Safety Absolutes" and company policy, nothing happened to the supervisor.

37.     Further, it is not proper for someone who is involved in an incident to write the incident report, and the report that was done was written in a biased manner to remove the supervisor's wrongdoings.

38.     The result of the incident was that Plaintiff was taken off of work for two months due to the re-injury to his ankle.

39.     Despite this treatment, Plaintiff persisted, was highly ranked within his company, and was promoted four times to the position of 4th hand by February of 2017.

40.     In February 2017, Plaintiff was struck by a GMC Envoy, causing substantial injuries to his person.

41.     In fact, the injuries were so substantial that Plaintiff was forced to go through multiple, extensive and serious surgeries, that required a long period of rehabilitation.

42.     After about six months off of work and extensive rehabilitation, Plaintiff attempted to return to work and informed Defendant that he was at less than full strength.

43.     Again, Plaintiff was warned by co-workers that he would be targeted by management after returning from medical leave and told to be careful.

44.     On August 15, 2017, Plaintiff attempted to return to work, however, Defendant moved him to a position he had never worked before that required extreme use of his hand and grip strength, which was impaired in the accident.

45.     Specifically, when Plaintiff returned to work, Defendant, for the first time ever, forced Plaintiff to hold an industrial strength high pressure hose for hours at a time.

46.     This is despite the fact that Plaintiff's new job was not in his normal duties and he had never been asked to perform this function before, and this function was usually preserved for individuals who were at the level Plaintiff was when he was initially hired into the company.

47.     Further, Defendant had an intern watching over Plaintiff in the new job, who threatened to report him to management for, among other things, taking a water break and speaking to co-workers.

48.     In fact, Plaintiff reinjured his hand when he returned to work because Defendant forced Plaintiff to hold the industrial strength high pressure hose, and, further, this substantially set Plaintiff back in his ability to recover fully from the injury, causing further injury to Plaintiff's hand that may never fully heal.

49.     Specifically, the injury caused Plaintiff to be unable to form a grip with his hand.

50.     Plaintiff could not perform this job function, which was not his usual job prior to becoming injured, with his disability, and, as a result, Plaintiff attempted to find the supervisor of the unit so that he could ask for medical attention, relief from the task, and inquire into why he was being assigned this task.

51.     In response, Plaintiff was accused of not wanting to work and scolded.

52.     When Plaintiff told the intern to report his injury to "Lindsey," she told the intern that she could not because she was in a meeting.

7

53.     Plaintiff then walked off to find Lindsey and found her in her office ordering pizza.

54.     Plaintiff informed Lindsey of her pain and asked for a remedy that would allow him to either take periodic breaks or to find another method for him to continue working.

55.     Lindsey then yelled at Plaintiff and told him, essentially, that Defendant did not need him down there if he was not going to do his job.

56.     Plaintiff was not offered any medical attention nor was an incident report generated, which was against company policy.

57.     Upon information and belief, Defendant moved Plaintiff to this position in an attempt to put Plaintiff in a job he could not perform with his disability and injury.

58.     However, that same week, Plaintiff was interrogated about allegedly walking off of his job duties without union representation, in what seemed to be an attempt to set him up to say he could not perform the functions of his job; however, ironically, this was not "his" job prior to becoming injured.

59.     Thereafter, Plaintiff submitted specific restrictions to human resources ("HR") related to his ability to perform grip strength specific tasks; however, in response Defendant removed Plaintiff from his job entirely.

60.     Plaintiff sought and requested reinstatement to either his regular position, or a different position in which grip strength was not so essential, however, all of his requests were either rebuffed or wholly ignored.

61.     A few months later, Plaintiff took a physical for Defendant, which he passed, and, accordingly, Plaintiff expected to be reinstated to his position.

62.     However, Defendant refused to reinstate Plaintiff, despite Plaintiff passing the physical, and required Plaintiff, without citing to any documentation or mandates that Plaintiff be "100% and fully released" from all restrictions before Plaintiff could be reinstated.

63.     Plaintiff reached out to a union employee for guidance, in which he was told that his biggest issue was that Defendant did not accommodate restrictions – if they did it for him, they would have to do it for everyone else – and that the company would generally just try to "bleed [Plaintiff] out."

64.     As Plaintiff understood it, this meant that Defendant would just not pay employees who were injured, and because they could not go without pay, they would just work through their injuries without restrictions.

65.     Plaintiff was further advised that HR had agreed to pay him while the company figured out what they were going to do with him, which did not turn out to be true.

66.     Defendant, without citing any policy or mandate, informed Plaintiff that he was required to submit some sort of unspecified documentation to show that Plaintiff's hand was "100% fully recovered" before it would reinstate Plaintiff to any position.

67.     Plaintiff tirelessly attempted to obtain reinstatement, and, even attempted reinstatement using numerous different avenues; however, all of his pleas for reason were rebuffed.

68.     Plaintiff's undersigned counsel even tried to contact Jennifer Belice, Defendant's HR Generalist, in 2019, and no response was ever received.

69.     As recently as late 2020 or early 2021, after more unpaid time off because of his further injury and Defendant's refusal to reinstate Plaintiff into his previous position, and after his hand had more fully recovered, Plaintiff sought reinstatement from Defendant in any position;

however, Defendant refused to reinstate Plaintiff and specifically cited his disability as justification.

70.    During this time period, while Plaintiff was out of work, Plaintiff was deprived of income, overtime, and his contractually negotiated bonuses and fringe benefits.

71.    Following Plaintiff's inability to be reinstated, amounting to termination, on June 18, 2020, Plaintiff filed an intake questionnaire with the Detroit office of the Equal Employment Opportunity Commission ("EEOC") on the basis of his (1) Disability, (2) Race, and the (3) Retaliation he faced for attempting to take time off to heal and attempting to have his disability accommodated.

72.    As of this filing, Defendant maintains that Plaintiff is still on leave, and even "accidentally" tendered him a paycheck in September of 2020, sent him a plaque "congratulating" him on his five-year anniversary in November of 2019, and is still showing as an active employee by third-party administrators of employee benefits.

73.    Plaintiff requests relief as described in the Prayer for Relief below.

## <u>COUNT I</u>
### DISCRIMINATION ON THE BASIS OF DISABILITY IN VIOLATION OF TITLE I OF THE AMERICANS WITH DISABILITIES ACT OF 1990 42 U.S.C. § 12101, et seq. ("ADA")

74.    Plaintiff incorporates by reference all allegations in the preceding paragraphs.

75.    At all material times, Plaintiff was an employee, and Defendants were Plaintiff's employer, covered by and within the meaning of the ADA.

76.    A respondeat superior relationship existed because agents of Defendant had the ability to undertake or recommend tangible decisions affecting Plaintiff and the authority to direct all of Plaintiff's daily work activity.

77.     Plaintiff had a nerve condition and plate inserted into his hand, which resulted in him restricted use of his hand, and specifically grip strength; as a result, Plaintiff has a disability within the meaning of the ADA.

78.     Plaintiff's disabilities under the ADA are qualified, meaning that, with reasonable accommodation, he can perform the essential functions and duties of his job.

79.     Section 12112(a) of the ADA, makes it illegal to "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."

80.     Plaintiff was discriminated against on the basis of his disability when Defendant refused to allow him to return to work without first a note from his doctor that stated that his hand was 100 fully recovered.

81.     Defendant's unlawful employment practices were done intentionally, with malice, or with reckless indifference to Plaintiff's rights.

82.     But for Defendants' illegal discrimination Plaintiff would not have damaged, discharged, nor constructively discharged.

83.     As a direct and proximate result of Defendant's discriminatory actions, Plaintiff has suffered losses in compensation, earning capacity, humiliation, mental anguish, and emotional distress.

84.     As a result of those actions and consequent harms, Plaintiff has suffered such damages in an amount to be proven at trial.

85.     Plaintiff requests relief as described in the Prayer for Relief below.

**COUNT II**

## DISCRIMINATION ON THE BASIS OF DISABILITY IN VIOLATION OF THE MICHIGAN PERSONS WITH DISABILITY ACT, MCL 37.1201, et seq. ("PWDCRA")

86.     Plaintiff incorporates by reference all allegations in the preceding paragraphs.

87.     At all material times, Plaintiff was an employee, and Defendant was Plaintiff's employer, covered by and within the meaning of the PWDCRA.

88.     A respondeat superior relationship existed because agents of Defendant had the ability to undertake or recommend tangible decisions affecting Plaintiff and the authority to direct all of Plaintiff's daily work activity.

89.     Plaintiff has a disability within the meaning of the PWDCRA.

90.     Plaintiff's disability is qualified, meaning that, with reasonable accommodation, he can perform the essential functions and duties of his job.

91.     MCL 37.1202(b) makes it illegal to, "[d]ischarge or otherwise discriminate against an individual with respect to compensation or the terms, conditions, or privileges of employment, because of a disability … that is unrelated to the individual's ability to perform the duties of a particular job or position."

92.     Plaintiff was discriminated against on the basis of his disability when Defendant refused to reinstate him to work because of his disability.

93.     Defendant's unlawful employment practices were done intentionally, with malice, or with reckless indifference to Plaintiff's rights.

94.     But for Defendant's illegal discrimination Plaintiff would not have been damaged.

95.     As a direct and proximate result of Defendants' discriminatory actions, Plaintiff has suffered losses in compensation, earning capacity, humiliation, mental anguish, and emotional distress.

96.     As a result of those actions and consequent harms, Plaintiff has suffered such damages in an amount to be proven at trial.

97.     Plaintiff requests relief as described in the Prayer for Relief below.

<u>**COUNT III**</u>
**INTERFERENCE AND RETALIATION IN VIOLATION OF THE ADA**

98.     At all material times, Plaintiff was an employee, and Defendant was Plaintiff's employer, covered by and within the meaning of the PWDCRA.

99.     At all material times, Plaintiff was an employee, and Defendant was Plaintiff's employer, covered by and within the meaning of the ADA, 42 U.S.C. § 12101, et seq.

100.    A respondeat superior relationship existed because agents of Defendant had the ability to undertake or recommend tangible decisions affecting Plaintiff and the authority to direct all of Plaintiff's daily work activity.

101.    Plaintiff had a nerve condition and plate inserted into his hand, which resulted in him restricted use of his hand, and specifically grip strength; as a result, Plaintiff has a disability within the meaning of the ADA.

102.    Plaintiff's disabilities  under the  ADA  are qualified, meaning that, with reasonable accommodation, he can perform the essential functions and duties of his job.

103.    Section 12203(a) of the ADA makes it illegal for anyone to, "discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter."

104.    Plaintiff faced retaliation, and, Defendant's unwillingness to reinstate him to work because of his attempts to take time off related to his disability & because Plaintiff had demanded to be given his old position or a position that wasn't centered around his grip strength;

which Defendant placed him in previously when he returned, in what Plaintiff believes was further retaliation for taking that time off to rehabilitate his hand.

105.    Moreover, Section 12203(b) of the ADA makes it, "...unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed…"

106.    Defendants interfered with Plaintiff's ability to exercise rights under the ADA and the enjoyment of those rights when Defendant refused to discuss or consider any employment for Plaintiff, and, then stopped paying him completely because of the time he took off for his disability.

107.    Defendant's unlawful employment practices were done intentionally, with malice, or with  reckless indifference to Plaintiff's rights.

108.    But for Defendant's illegal discrimination Plaintiff would not have been damaged nor discharged.

109.    As  a direct and direct and  proximate result of Defendant's discriminatory actions, Plaintiff has  suffered losses in compensation, earning capacity, humiliation, mental anguish, and emotional distress.

110.    As a result of those actions and consequent harms, Plaintiff has suffered such damages in an amount to be proven at trial.

111.    Plaintiff requests relief as described in the Prayer for Relief below.

## COUNT IV
## INTERFERENCE AND RETALIATION IN VIOLATION OF THE PWDCRA

112.    Plaintiff incorporates by reference the allegations set forth above as if alleged herein.

113.   At all material times, Plaintiff was an employee, and Defendant was Plaintiff's employer, covered by and within the meaning of the PWDCRA.

114.   A respondeat superior relationship existed because agents of Defendant had the ability to undertake or recommend tangible decisions affecting Plaintiff and the authority to direct all of Plaintiff's daily work activity.

115.   Plaintiff has a disability within the meaning of the PWDCRA.

116.   Plaintiff's disability is qualified, meaning that, with reasonable accommodation, he can perform the essential functions and duties of his job.

117.   MCL 37.1602(a) makes it illegal to "[r]etaliate or discriminate against a person because the person has opposed a violation of this act."

118.   Plaintiff faced retaliation, and, Defendant's unwillingness to reinstate him to work because of his attempts to take time off related to his disability & because Plaintiff had demanded to be given his old position or a position that wasn't centered around his grip strength; which Defendant placed him in previously when he returned, in what Plaintiff believes was further retaliation for taking that time off to rehabilitate his hand.

119.   Moreover, MCL 37.1602(f) makes it illegal to, [c]oerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of… any right granted or protected by article 5."

120.   Defendants interfered with Plaintiff's ability to exercise rights under the ADA and the enjoyment of those rights when Defendant refused to discuss or consider any employment for Plaintiff, and, then stopped paying him completely because of the time he took off for his disability.

121.   Defendants' unlawful employment practices were done intentionally, with malice, or with reckless indifference to Plaintiff's rights.

122.    But for Defendant's illegal discrimination Plaintiff would not have been damaged nor constructively discharged.

123.    As a direct and proximate result of Defendant's discriminatory actions, Plaintiff has suffered losses in compensation, earning capacity, humiliation, mental anguish, and emotional distress.

124.    As a result of those actions and consequent harms, Plaintiff has suffered such damages in an amount to be proven at trial.

125.    Plaintiff requests relief as described in the Prayer for Relief below

**COUNT V**
**FAILURE TO ACCOMMODATE IN VIOLATION OF THE ADA**

126.    Plaintiff incorporates by reference all allegations in the proceeding paragraphs.

127.    At all material times, Plaintiff was an employee, and Defendant was an employer, covered by and within the meaning of the ADA, 42 U.S.C. §§§ 12111 (4) 12111(2); 12111(5).

128.    A respondeat superior relationship existed because agents of Defendant had the ability to undertake or recommend tangible decisions affecting Plaintiff and the authority to direct all of Plaintiff's daily work activity.

129.    Plaintiff has a disability within the meaning of the ADA, 42 U.S.C. § 12102.

130.    Plaintiff's disability under the ADA is qualified, meaning that, with reasonable accommodation, he can perform the essential functions and duties of his job.

131.    Plaintiff's requested accommodation included allowing Plaintiff reasonable time off to treat his disability and a position that did not have as much focus on his grip strength.

132.    The ADA, 42 U.S.C. §12112, prohibits an employer from discriminating against an employee on the basis of disability.

133.    Defendant violated the ADA, 42 U.S.C. §12112, when it engaged in the following, including but not limited to terminating Plaintiff for his attempts to reasonably treat his disability.

134.    Defendant's said unlawful employment practices were done intentionally, with malice, or with reckless indifference to Plaintiff's rights.

135.    Plaintiff requests relief as described in the Prayer for Relief below.

## COUNT VI
## FAILURE TO ACCOMMODATE IN VIOLATION OF THE PWDCRA

136.    Plaintiff incorporates by reference all allegations in the proceeding paragraphs.

137.    At all material times, Plaintiff was an employee, and Defendant was an employer, covered by and within the meaning of the PWDCRA, MCL 37.1201 et seq.

138.    A respondeat superior relationship existed because agents of Defendant had the ability to undertake or recommend tangible decisions affecting Plaintiff and the authority to direct all of Plaintiff's daily work activity.

139.    Plaintiff has a disability within the meaning of the PWDCRA, MCL 37.1103(e).

140.    Plaintiff's disability under the PWDCRA is qualified, meaning that, with reasonable accommodation, he can perform the essential functions and duties of his job.

141.    Plaintiff's requested accommodation included allowing Plaintiff reasonable time off to treat his disability and a position that did not have as much focus on his grip strength The PWDCRA, MCL § 37.1202, prohibits an employer from discriminating against an employee on the basis of disability.

142.    Defendant violated the PWDCRA, MCL § 37.1202(1)(g), when it engaged in the following, including but not limited to terminating Plaintiff for his attempts to reasonably treat his disability.

143.    Defendant's said unlawful employment practices were done intentionally, with malice, or with reckless indifference to Plaintiff's rights.

144.    Plaintiff requests relief as described in the Prayer for Relief below.

<u>**COUNT VII**</u>
**HOSTILE WORKPLACE ENVIRONMENT IN VIOLATION OF THE ADA**

145.    Plaintiff incorporates by reference all allegations in the preceding paragraphs.

146.    At all material times, Defendant was an employer and Plaintiff was an employee covered by, and within the meaning of, the ADA, as amended.

147.    A respondeat superior relationship existed because agents of Defendant had the ability to undertake or recommend tangible decisions affecting Plaintiff and the authority to direct all of Plaintiff's daily work activity.

148.    Defendant's conduct, as alleged herein, violated the ADA which makes it unlawful to create a work environment that a reasonable person would consider intimidating, hostile, or abusive.

149.    Defendant's treatment, retaliation, and abuse of Plaintiff directly related to his disability, as alleged in the statement of facts, constituted this hostile workplace.

150.    The communication and conduct were unwelcomed.

151.    The unwelcomed conduct and communication were intended to, or in fact did, substantially interfere with Plaintiff's employment, and created an intimidating, hostile. and offensive work environment, as alleged in the statement of facts.

152.     As a direct and proximate result of Defendant's discriminatory actions, Plaintiff has suffered losses in compensation, earning capacity, humiliation, mental anguish, and emotional distress.

153.     As a result of those actions and consequent harms, Plaintiff has suffered such damages in an amount to be proven at trial.

154.     Plaintiff requests relief as described in the Prayer for Relief below.

## COUNT VIII
## HOSTILE WORKPLACE ENVIRONMENT IN VIOLATION OF THE PWDCRA

155.     Plaintiff incorporates by reference all allegations in the preceding paragraphs.

156.     At all material times, Defendant was an employer and Plaintiff was an employee covered by, and within the meaning of, the PWDCRA, as amended.

157.     A respondeat superior relationship existed because agents of Defendant had the ability to undertake or recommend tangible decisions affecting Plaintiff and the authority to direct all of Plaintiff's daily work activity.

158.     Defendant's conduct, as alleged herein, violated the PWDCRA which makes it unlawful to create a work environment that a reasonable person would consider intimidating, hostile, or abusive.

159.     Defendant's treatment, retaliation, and abuse of Plaintiff directly related to his disability, as alleged in the statement of facts, constituted this hostile workplace.

160.     The communication and conduct were unwelcomed.

161.     The unwelcomed conduct and communication were intended to, or in fact did, substantially interfere with Plaintiff's employment, and created an intimidating, hostile. and offensive work environment, as alleged in the statement of facts.

162.     As a direct and proximate result of Defendant's discriminatory actions, Plaintiff has suffered losses in compensation, earning capacity, humiliation, mental anguish, and emotional distress.

163.     As a result of those actions and consequent harms, Plaintiff has suffered such damages in an amount to be proven at trial.

164.     Plaintiff requests relief as described in the Prayer for Relief below.

**COUNT IX**
**DISCRIMINATION ON THE BASIS OF RACE IN VIOLATION OF TITLE VII OF THE**
**CIVIL RIGHTS ACT OF 1964, 42 U.S.C. 2000e** *et seq*. **("Title VII")**

165.     Plaintiff incorporates by reference all allegations in the preceding paragraphs.

166.     At all material times, Defendant was an employer and Plaintiff an employee covered by, and within the meaning of, Title VII, as amended.

167.      Defendant's conduct, as alleged herein, violated Title VII of the Civil Rights Act of 1964, which makes it unlawful to harass or discriminate an employee on the basis of that employee's skin color.

168.     A respondeat superior relationship existed because agents of Defendant had the ability to undertake or recommend tangible decisions affecting Plaintiff and the authority to direct all of Plaintiff's daily work activity.

169.     Plaintiff is African-American, and, as a result, is a member of a protected class, pursuant to Title VII.

170.     Previously, Defendant has treated Caucasian employees with minor disabilities to a different standard than that of African-American employees, and had further not punished Caucasian employees for misconduct towards him and others for which African-American employees were punished or terminated.

171.    This conduct was unwelcomed.

172.    Defendant and its agents' unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Plaintiff's rights.

173.    The unwelcomed conduct or communication was intended to or in fact did substantially interfere with Plaintiff's employment and created an intimidating, hostile, or offensive work environment, as alleged in the statement of facts.

174.    As a proximate result of Defendant's discriminatory actions, Plaintiff has suffered losses in compensation, earning capacity, humiliation, mental anguish, and emotional distress.

175.    As a result of those actions and consequent harms, Plaintiff has suffered such damages in an amount to be proven at trial.

176.    Plaintiff requests the relief as described in the Prayer for Relief below.

## COUNT X
### DISCRIMINATION ON THE BASIS OF RACE IN VIOLATION OF THE MICHIGAN ELLIOTT-LARSEN CIVIL RIGHTS ACT, MCL 37.2101 et seq. ("ELCRA")

177.    Plaintiff incorporates by reference all allegations in the preceding paragraphs.

178.    At all material times, Defendant was an employer and Plaintiff was an employee covered by, and within the meaning of the ELCRA.

179.    Defendant's conduct, as alleged herein, violated the ELCRA which makes it unlawful to harass or discriminate against an employee because of their race or skin color.

180.    A respondeat superior relationship existed because agents of Defendant had the ability to undertake or recommend tangible decisions affecting Plaintiff and the authority to direct all of Plaintiff's daily work activity.

181.    Plaintiff is African-American, and, as a result, is a member of a protected class, pursuant to the ELCRA VII.

182.    Previously, Defendant has treated Caucasian employees with minor disabilities to a different standard than that of African-American employees, and had further not punished Caucasian employees for misconduct towards him and others for which African-American employees were punished or terminated.

183.    This conduct was unwelcomed.

184.    This unwelcomed conduct was intended to or in fact did substantially interfere with Plaintiff's employment or created an intimidating, hostile, or offensive work environment as alleged in the statement of facts.

185.    As a direct and proximate result of the Defendant's wrongful acts and omissions, Plaintiff has sustained loss of earnings, earning capacity, and fringe benefits and have suffered mental anguish, emotional distress, humiliation and embarrassment, and loss of professional reputation.

186.    Plaintiff requests relief as described in the Prayer for Relief below.

<u>**COUNT XI**</u>
**RETALIATION IN VIOLATION OF TITLE VII**

187.    Plaintiff incorporates by reference all allegations in the preceding paragraphs.

188.    At all material times, Defendant was an employer and Plaintiff was an employee covered by, and within the meaning of, Title VII, as amended.

189.    A respondeat superior relationship existed because agents of Defendant had the ability to undertake or recommend tangible decisions affecting Plaintiff and the authority to direct all of Plaintiff's daily work activity.

190.    Defendant's conduct, as alleged herein, violated Title VII which makes it unlawful to harass or retaliate against an employee for engaging in protected activity.

191.    Plaintiff engaged in protected activity, as more fully laid out in the statement of facts, including, but not limited to, his complaints about being mistreated on the basis of race.

192.    Defendant, through its agents, had knowledge that Plaintiff engaged in protected behavior because Plaintiff, and others, complained directly to Defendant's employees about the treatment of African-American employees.

193.    After Plaintiff engaged in protected activity, Defendant's agents thereafter took several adverse employment actions against Plaintiff, as alleged in the statement of facts and herein, culminating in to Plaintiff's termination or constructive termination.

194.    Defendant and its agents' unlawful actions were intentional, willful, malicious and/or done with reckless disregard of Plaintiff's rights.

195.    Plaintiff notified Defendant and its agents of the unwelcomed conduct and communication; however, Defendant failed to remedy the same.

196.    As a proximate result of Defendant's discriminatory actions, Plaintiff has suffered losses in compensation, earning capacity, humiliation, mental anguish, and emotional distress.

197.    As a result of those actions and consequent harms, Plaintiff has suffered such damages in an amount to be proved at trial.

198.    Plaintiff requests relief as described in the Prayer for Relief below.

## COUNT XII
## RETALIATION IN VIOLATION OF THE ELCRA

199.    Plaintiff incorporates by reference all allegations in the preceding paragraphs.

200.    At all material times, Plaintiff was an employee, and Defendant was his employer covered by, and within the meaning of, the ELCRA.

201.    A respondeat superior relationship existed because agents of Defendant had the ability to undertake or recommend tangible decisions affecting Plaintiff and the authority to direct all of Plaintiff's daily work activity.

202.    Defendant's conduct, as alleged herein, violated the ELCRA which makes it unlawful to retaliate against an employee who has engaged in protected activity.

203.    Plaintiff engaged in protected activity, as more fully laid out in the statement of facts, including, but not limited to, his complaints about being mistreated on the basis of race.

204.    Defendant, through its agents, had knowledge that Plaintiff engaged in protected behavior because Plaintiff, and others, complained directly to Defendant's employees about the treatment of African-American employees.

205.    After Plaintiff engaged in protected activity, Defendant's agents thereafter took several adverse employment actions against Plaintiff, as alleged in the statement of facts and herein, culminating in to Plaintiff's termination or constructive termination.

206.    Defendant and its agents' unlawful actions were intentional, willful, malicious and/or done with reckless disregard of Plaintiff's rights.

207.    Plaintiff notified Defendant and its agents of the unwelcomed conduct and communication; however, Defendant failed to remedy the same.

208.    As a proximate result of Defendant's discriminatory actions, Plaintiff has suffered losses in compensation, earning capacity, humiliation, mental anguish, and emotional distress.

209.    As a result of those actions and consequent harms, Plaintiff has suffered such damages in an amount to be proved at trial.

210.    Plaintiff requests relief as described in the Prayer for Relief below.

## COUNT XIII
## HOSTILE WORKPLACE ENVIRONMENT IN VIOLATION OF TITLE VII

211.     Plaintiff incorporates by reference all allegations in the preceding paragraphs.

212.     At all material times, Defendant was an employer and Plaintiff was an employee covered by, and within the meaning of, Title VII, as amended.

213.     A respondeat superior relationship existed because agents of Defendant had the ability to undertake or recommend tangible decisions affecting Plaintiff and the authority to direct all of Plaintiff's daily work activity.

214.     Defendant's conduct, as alleged herein, violated Title VII which makes it unlawful to create a work environment that a reasonable person would consider intimidating, hostile, or abusive.

215.     Plaintiff's work environment, as alleged in the statement of facts,

216.     Moreover, Plaintiff's continual attempts to have the situation remedied, coupled with Defendant's ability to accuse Plaintiff of misbehaving made the situation untenable.

217.     The communication and conduct were unwelcomed.

218.     The unwelcomed conduct and communication were intended to, or in fact did, substantially interfere with Plaintiff's employment, and created an intimidating, hostile. and offensive work environment, as alleged in the statement of facts.

219.     As a direct and proximate result of Defendant's discriminatory actions, Plaintiff has suffered losses in compensation, earning capacity, humiliation, mental anguish, and emotional distress.

220.     As a result of those actions and consequent harms, Plaintiff has suffered such damages in an amount to be proven at trial.

221.    Plaintiff requests relief as described in the Prayer for Relief below.

<b><u>COUNT XIV</u></b><br>
<b>HOSTILE WORKPLACE ENVIRONMENT IN VIOLATION OF THE ELCRA</b>

222.    Plaintiff incorporates by reference all allegations in the preceding paragraphs.

223.    At all material times, Plaintiff was an employee, and Defendant was his employer covered by, and within the meaning of, the ELCRA.

224.    A respondeat superior relationship existed because agents of Defendant had the ability to undertake or recommend tangible decisions affecting Plaintiff and the authority to direct all of Plaintiff's daily work activity.

225.    Defendant's conduct, as alleged herein, violated the ELCRA which makes it unlawful to create a work environment that a reasonable person would consider intimidating, hostile, or abusive.

226.    Plaintiff's work environment was hostile, as alleged in the statement of facts.

227.    Moreover, Plaintiff's continual attempts to have the situation remedied, coupled with Defendant's ability to accuse Plaintiff of misbehaving made the situation untenable.

228.    The unwelcomed conduct and communication was intended to, or in fact did, substantially interfere with Plaintiff's employment, and created an intimidating, hostile, or offensive work environment, as alleged in the statement of facts.

229.    As a direct and proximate result of Defendant's discriminatory actions, Plaintiff has suffered losses in compensation, earning capacity, humiliation, mental anguish, and emotional distress.

230.    As a result of those actions and consequent harms, Plaintiff has suffered such damages in an amount to be proven at trial.

231.    Plaintiff requests relief as described in the Prayer for Relief below.

## **RELIEF REQUESTED**

PLAINTIFF, WILLIAM KELLY, respectfully requests that this Honorable Court enter

judgment against Defendant as follows:

1.  Compensatory damages in whatever amount to which Plaintiff is entitled;
2.  Exemplary damages in whatever amount which Plaintiff is entitled;
3.  An award of lost wages and the value of fringe benefits, past and future;
4.  An award of interest, costs, and reasonable attorney fees; and
5.  An order awarding whatever other equitable relief appears appropriate at the time of final judgment.

Dated:  September 3, 2021

Respectfully Submitted,

/s/ Connor Gallagher_____
Connor B. Gallagher (P82104)
Carla D. Aikens (P69530)
CARLA D. AIKENS, P.C.
*Attorneys for Plaintiff*
615 Griswold Ste. 709
Detroit, MI 48226
carla@aikenslawfirm.com
connor@aikenslawfirm.com