UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WILLIAM KELLY,

     Plaintiff,

                                        Case No. 1:21-cv-772

v.

                                        HON. JANE M. BECKERING

GRAPHIC PACKAGING
INTERNATIONAL, LLC,

     Defendant.

_____/

**OPINION**

Plaintiff William Kelly initiated this disability, race, and employment discrimination case against Defendant Graphic Packaging International, LLC on September 3, 2021.  On June 6, 2023, this Court issued an Opinion and Order granting in part and denying in part Defendant's motion for summary judgment and dismissing all but one of Plaintiff's claims (ECF No. 77).  Plaintiff's remaining claim of retaliation under the Americans with Disabilities Act (ADA) was tried to the Court on January 30, January 31, February 1, February 2, and February 5, 2024, and the parties subsequently filed revised proposed findings of fact and conclusions of law (ECF No. 163; ECF No. 164 (corrected by ECF No. 165)).[1]  In accordance with Federal Rule of Civil Procedure 52(a), this Opinion contains the Court's Findings of Fact and Conclusions of Law.  For the reasons

---

[1] The Court has adopted, in most respects and without attribution, language proposed by one of the parties.  In all such instances, the Court adopts the party's proposed finding of fact or conclusion of law as the Court's own, based upon its review of the evidence and the law.  To the extent that any of the Court's findings of fact may be considered conclusions of law or vice versa, they should be considered as such.

delineated herein, the Court determines that Plaintiff has not carried his burden of proving that Defendant retaliated against him in violation of the ADA.

## I.      FINDINGS OF FACT

The Court finds the facts stated herein based on its evaluation of the evidence, including the credibility of the witnesses, and the inferences that the Court has found reasonable to draw from the evidence.

### A.  Overview

1. Plaintiff bases this ADA retaliation and interference claim on Defendant's decision regarding Plaintiff's return-to-work in September 2019, after Plaintiff had initially been placed on a leave of absence in August 2017.

2. Defendant Graphic Packaging International, LLC (GPI) is a worldwide maker of paperboard and paperboard products.  (Stipulation of Facts [ECF No. 133 at PageID.3014] ¶ 2(a).).

   a. Defendant is headquartered in Atlanta, Georgia, but has manufacturing facilities throughout the United States, including a Board Mill in Kalamazoo, Michigan.  (*id.*)

   b. Employees at the Kalamazoo Board Mill are represented by the United Steelworkers Local No. 2-1010.  (*id.* ¶ 2(c).)

### B.  Defendant's Policies

3. Defendant has a comprehensive set of policies with respect to discrimination, retaliation and harassment, and disability accommodation.  (GPI Policy Statement, Def. Trial Ex. C.)

   a. These policies are administered to all employees, subject to the requirements of any applicable collective bargaining agreement.  (Simon Trial Dep., ECF No. 154 at PageID.3438.)

    b.   Defendant communicates its policies to new employees as part of the orientation process.  (Bench Trial Tr., ECF No. 160 at PageID.4696–97 (Kelly).)

    c.   Defendant has policies prohibiting discrimination, harassment, and retaliation on the basis of any legally protected characteristic or activity.  (GPI Policy Statement.)

    d.   Defendant also has policies to provide reasonable accommodation to individuals with disabilities.  (*id.*)

4.   Any employee subject to any violation of Defendant's policies is expected to report such violation to the local Human Resources ("HR") representative or Corporate Resources Department.  (GPI Policy Statement at 4.)

    a.   Defendant provides a toll-free "Alertline" for purposes of reporting policy violations.  (*id.*)

5.   Under Defendant's policies, a request for a disability accommodation may include, but is not limited to, a leave of absence.  (*id.*)

    a.   The process for requesting a leave of absence is separate from the process for other requests for accommodation.  (*id.*)

    b.   When requesting an accommodation, the employee has the responsibility to be specific as to the accommodation requested.  (Simon Trial Dep., ECF No. 154 at PageID.3453, 3472.)

    c.   The employee requesting an accommodation must provide medical information to Defendant's HR personnel, so that Defendant can understand what the accommodation needs to be and whether the employee can work safely and perform the essential functions of the job.  (*id.* at PageID.3453, 3472.)

    d.  Defendant handles every accommodation request individually based on the particular facts and circumstances presented.  (*id.* at PageID.3465.)

6.  Any employee who believes his or her rights to reasonable accommodation have been violated is expected to report such violation to the local HR representative or Corporate Resources Department, or may report via the Alertline.  (Bench Trial Tr., ECF No. 161 at PageID.4852–53 (Kelly); GPI Policy Statement at 2–4.)

### C.  Collective Bargaining Agreement

7.  The terms and conditions of employment for bargaining unit employees at Defendant's Mill facility are set forth in a collective bargaining agreement ("CBA").  (2017–2023 CBA, Def. Trial Ex. B.)

    a.  Included in the CBA are provisions on: (1) illness, which specify the types of leave and rules that apply to the grant and administration of leaves of absence to bargaining unit employees; (2) disabled employees, which specify the negotiated rules and benefits applicable to bargaining unit employees who are or become disabled; and (3) job bidding procedures governing how employees may be placed. (2017–2023 CBA at 31 & 32.)

    b.  The CBA also includes a grievance and arbitration procedure whereby a covered employee can submit a grievance with respect to any alleged violation of the CBA. (*id.*)

8.  The CBA specifies procedures a bargaining unit employee may follow if removed from his regular position due to disability from injury or illness that renders him unable to perform job functions.  (*id.*)

a. If the employee is unable to perform job functions, Defendant will consider a job change or transfer, but those options are limited by the CBA.  (Simon Trial Dep., ECF No. 154 at PageID.3459.)

b. In addition, the employee must request a job change.  (*id.* at PageID.3460.)

c. Employees with disabilities are permitted to bid on jobs that are within their restrictions if they wish, and to appeal to the bargaining committee for additional assistance.  (2017–2023 CBA at 32 & 33.)

9. The CBA also provides leave to employees who are unable to work for medical reasons. (2017–2023 CBA at 14 & 15.)

a. Pursuant to the CBA, Defendant may grant a leave of absence for up to two years (24 months) if the employee was injured outside of work.  (Simon Trial Dep., ECF No. 154 at PageID.3479; Bench Trial Tr., ECF No. 162 at PageID.5118–19 (Strey).)

b. If the employee is unable to return to work within two years without being able to perform the essential functions of the job or without a reasonable accommodation, the employee's seniority and employment will terminate.  (Simon Trial Dep., ECF No. 154 at PageID.3478–79.)

c. Pursuant to the CBA, Defendant may grant a leave of absence for up to three years (36 months) if the employee was injured at work.  (Bench Trial Tr., ECF No. 162 at PageID.5118–19 (Strey).)

10. There is no restriction in the CBA limiting Defendant from changing an employee's assignment from one machine to another machine. (Bench Trial Tr., ECF No. 161 at PageID.4968 (Black).)

11. In order for an employee to enter the line of progression, he or she has to sign a bid.  (Bench Trial Tr., ECF No. 161 at PageID.4970 (Black).)

    a.  Once an employee is in the line of progression, there can be situations in which he or she is moved up without signing a bid.  (*id.* at PageID.4971 (Black).)

12. Article VI, Section 14 of the Collective Bargaining Agreement, "Disabled Employees," has been implemented by Defendant and the Union in the past.  (Bench Trial Tr., ECF No. 161 at PageID.4971–72 (Black).)

    a.  Andy Black ("Black") was, until September 2023, Operations Manager for Defendant's Kalamazoo Mill.  (Bench Trial Tr., ECF No. 161 at PageID.4964 (Black).)

        i.  Black began working at Defendant's Kalamazoo Mill in 1993.  (*id.*)

        ii.  Black served on the collective bargaining committee during the most recent contract negotiations in the Kalamazoo Mill.  (*id.* at PageID.4965 (Black).)

    b.  Black testified as to the operation of the CBA, in particular, how Defendant implemented the "Disabled Employees" provision while he was Operations Manager at the Kalamazoo Mill.  (*id.* at PageID.4971–4974)

    c.  The "Disabled Employees" provision of the CBA was used for an employee named Dan Burland.  (*id.* at PageID.4972.)

        i.  Dan Burland was injured at work and could not perform any jobs available to him in the line of progression.  (*id.*)

        ii.  At the time, there was an open paper tester job.  (*id.*)

6

    iii.  The Union and management worked together to assign Dan Burland to the paper tester job using the "Disabled Employees" provision of the CBA, even though he did not have the seniority to obtain that job.  (*id.*)

d.  Approximately five years ago, another employee, named Larry Vestal, returned after a lengthy medical leave of absence from work.  (*id.* at PageID.4973.)

    i.  Larry Vestal had a personal medical issue, and his condition was not work-related. (*id.*)

    ii.  Larry Vestal was out on medical leave for almost two years.  (*id.* at PageID.4995.)

    iii.  Defendant accommodated Larry Vestal in the return-to-work process.  (*id.* at PageID.4973.)

    iv.  Larry Vestal had cognitive limitations when he returned to work, and Defendant provided him with extra training and extra support for "a significant period of time."  (*id.*)

    v.  Larry Vestal's position was "fill-in man" on the K-1 Machine, a position he still held at the time of Black's departure from the Kalamazoo Mill.  (*id.*)

    vi.  Jennifer Strey ("Strey") was the Human Resources Manager at the time of Larry Vestal's return.  (*id.* at PageID.4974.)

e.  Carla Gentry is another employee who returned to work for Defendant after a lengthy medical leave of absence.  (*id.*)

    i.  Carla Gentry was on a medical leave of absence for approximately one year after sustaining a head injury at work.  She returned in 2019.  (*id.*)

ii.   Upon her return to work, Defendant set Carla Gentry up with 2–3 weeks of additional training.  (*id.*)

iii.   Strey was the Human Resources Manager at the time of Carla Gentry's return.  (*id.*)

**D.  Defendant's Process for Medical Leave Administration and Return to Work**

13. Defendant uses a third-party administrator ("TPA") to determine employee eligibility for leave status and leave pay benefits.  (Bench Trial Tr., ECF No. 162 at PageID.5086 (Belice).)

14. When an employee is on a leave of absence, the employee is only required to provide updates regarding his or her medical care and status so that Defendant can monitor the process.  (Belice Trial Dep., ECF No. 155 at PageID.3730.)

15. When an employee notifies Defendant of a desire to return to work, the employee is required to undergo a return-to-work physical.  (*id.*)

a.   If the employee has restrictions in place at the time of a requested return-to-work, Defendant will determine whether the restrictions can be accommodated.  (*id.* at PageID.3755.)

16. Under Defendant's policy, an employee is not required to have a release that fully releases them without restrictions in order for the employee to be able to return to work.  (*id.* at PageID.3766.)

17. A medical replacement or vacation replacement employee is a temporary position.  (Bench Trial Tr., ECF No. 161 at PageID.4966 (Black).)

a.   When someone becomes a mill utility worker, they become a full-time, permanent employee.  (*id.* at PageID.4966–67)

8

b.  There is no rule in the CBA stating that a medical replacement employee converts to permanent status after 90 days.  (*id.* at PageID.4967.)

### E.  Physical Work Environment

18. The Mill facility houses paper machines that are very large, up to four stories tall, with work stations at multiple levels and stairs or ladders that employees must use to reach the various work stations on the machines.  (Simon Trial Dep., ECF No. 154 at PageID.3650, 3653.)

19. All or nearly all of the bargaining unit roles in the Mill require stairs, ladders, and/or climbing as a substantial and necessary part of job functions.  (*id.* at PageID.3559, 3609–610.)

20. To the extent that any jobs implicate these stairs, ladders, and/or climbing less than others, all positions are subject to the CBA's negotiated job bid process, which requires awarding jobs on the basis of seniority.  (*id.* at PageID.3461, 3560, 3562.)

### F.  Plaintiff's Employment Events

21. Defendant hired Plaintiff into the Board Mill as a production employee in November 2014. (Stipulation of Facts ¶ 2(b), ECF No. 133.)

a.  Plaintiff was initially assigned to the K-3 Machine.  (Bench Trial Tr., ECF No. 159 at PageID.4479 (Kelly).)

b.  Black testified that an employee's seniority date begins when they are hired as a regular, permanent, full-time employee.  (Bench Trial Tr., ECF No. 161 at PageID.4983–84 (Black).)

22. After working for approximately eight months, Plaintiff fractured his ankle in an off-duty, non-work-related incident in June 2015.  (Bench Trial Tr., ECF No. 159 at PageID.4479 (Kelly).)

    a. After fracturing his ankle, Plaintiff was off of work for a year and returned to work in June 2016 (Bench Trial Tr., ECF No. 160 at PageID.4709–10 (Kelly); Kelly Employment Events Calendar, Def. Trial Ex. P at 2–3.)

    b. Plaintiff received paid short-term and long-term disability benefits from Defendant for the year-long period he was out.  (Bench Trial Tr., ECF No. 160 at PageID.4593–94 (Kelly).)

    c. After approximately one year of leave, Plaintiff was cleared to work on a full release with no restrictions (*id.* at PageID.4710 (Kelly).)

23. Plaintiff returned to work on June 29, 2016.  (*id.* at PageID.4710 (Kelly); Kelly Employment Events at 3.)

    a. Upon his return, Plaintiff repeated orientation due to the length of his absence. (Bench Trial Tr., ECF No. 160 at PageID.4710 (Kelly).)

    b. Plaintiff was then assigned to the K-1 Machine and worked there for approximately the next nine months.  (*id.*)

    c. Defendant did not provide an explanation to Plaintiff as to why he was assigned to K-1 and working under people over whom he had seniority.  (Bench Trial Tr., ECF No. 159 at PageID.4480 (Kelly).)

24. In November 2016, Plaintiff's ankle was injured at work on a machine.  (Bench Trial Tr., ECF No. 159 at PageID.4494–95 (Kelly).)

    a. After the incident, Plaintiff was told to sit in the break room and wait, which he did for "hours."  (*id.* at PageID.4504.)

    b. The following morning, Jennifer Jackson ("Jackson"), who was working in Defendant's HR department at the time, accompanied Plaintiff to urgent care.  (*id.* at PageID.4507–08.)

    c. At the urgent care visit, Plaintiff received work restrictions to stay off his feet.  (*id.* at PageID.4511.)

    d. During Plaintiff's next scheduled shift, for the "first day or two," Defendant told Plaintiff to sit in the break room, so he showed up, sat there for eight hours, then left.  (*id.*)

    e. After a couple of days, Jackson told Plaintiff he was going to the paper testing lab (*id.* at PageID.4514, 4516.)

    f. Plaintiff went to the paper testing lab, but was not working in the job of paper tester and did not have anything to do.  (*id.* at PageID.4519.)

    g. Plaintiff returned to his job on the K-1 Machine after approximately a few weeks, but he testified that he was not sure when he "went back to normal."  (*id.* at PageID.4522.)

25. In February 2017, Plaintiff was in a car accident and sustained an injury to his thumb.  (*id.* at PageID.4725 (Kelly).)

    a. Plaintiff went off of work and was approved for a leave of absence.  (*id.* at PageID.4727.)

    b. Plaintiff's leave continued for approximately six months.  (*id.* at PageID.4728.)

    c.  During his leave, Plaintiff received wage loss benefits through an automobile insurance policy.  (*id.*)

26. In August 2017, Plaintiff's personal physician released him with no restrictions.  (*id.* at PageID.4733 (Kelly).)

    a.  Plaintiff likewise considered himself to be completely healed as of that point.  (*id.*)

    b.  Plaintiff successfully completed Defendant's required return-to-work physical. (*id.* at PageID.4734.)

    c.  Plaintiff understood that in order to return to work, he needed to have "no restrictions."  (*id.* at PageID.4533.)

27. Plaintiff returned to work on approximately August 15, 2017.  (*id.*)

    a.  Plaintiff had been promoted through the CBA's line-of-progression process several times during his leave of absence.  (*id.* at PageID.4734.)

    b.  Plaintiff had achieved a bid position as a Fourth Hand on the K-3 Machine at the time of his return.  (*id.*)

    c.  The K-3 Machine was regarded by employees as being a less strenuous work location than the K-1 Machine to which Plaintiff had previously been assigned. (Bench Trial Tr., ECF No. 159 at PageID.4543 (Kelly).)

    d.  The last time that Plaintiff had been assigned to and worked on the K-3 Machine in any capacity was more than two years earlier, in June 2015.  (Bench Trial Tr., ECF No. 160 at PageID.4734–35, 4737 (Kelly).)

    e.  The Fourth Hand job was a higher paying job than the one Plaintiff had held previously.  (*id.* at PageID.4737–38.)

f.  Because of Plaintiff's progression through to jobs he had never held previously and the length of time since he had last worked on the K-3 Machine, he needed training on his position prior to being assigned to it independently.  (Bench Trial Tr., ECF No. 158 at PageID.4150 (Wilson).)

g.  Plaintiff's August 15, 2017 return date was on a Tuesday, which was in the middle of the weekly schedule period.  (Bench Trial Tr., ECF No. 161 at PageID.5029 (Kelly).)

h.  Plaintiff's name did not yet appear on the weekly schedule, which is generally published the Thursday before each week.  (Ariganello Trial Dep., ECF No. 151-1 at PageID.3347; Bench Trial Tr., ECF No. 161 at PageID.5002 (Black).)

i.  Black testified about the weekly schedule for the week of Plaintiff's return to work in 2017.  (Bench Trial Tr., ECF No. 161 at PageID.4975 (Black).)

j.  Black explained that by looking at the "mandatory overtime" section of the schedule, you can see that two employees were working overtime so that there was no gap in coverage.  (*id.* at PageID.4976.)

k.  In other words, the Third Hand position on K-3 was not vacant during the week of Plaintiff's return to the Kalamazoo Mill in 2017.  (*id.* at PageID.5002.)

l.  Black testified that there are several reasons why a schedule error—such as the schedule listing Plaintiff as still on medical leave the week he returned to work—might occur; for instance, if Plaintiff was not cleared for return by the time the schedule was posted the week prior.  (*id.* at PageID.5002–03.)

13

m.  Dave Ariganello ("Ariganello") was the K-3 supervisor on the day and shift on which Plaintiff reported to work.  (Ariganello Trial Dep., ECF No. 151-1 at PageID.3341.)

n.  Ariganello did not have any knowledge of any details regarding Plaintiff's leave of absence and had not supervised Plaintiff since he had last worked on the K-3 Machine more than two years previously.  (*id.* at PageID.3347; Bench Trial Tr., ECF No. 160 at PageID.4734–35, 4737 (Kelly).)

o.  Plaintiff spoke with Ariganello about what job he should do.  (Bench Trial Tr., ECF No. 159 at PageID.4536 (Kelly).)

p.  Ariganello instructed Plaintiff to observe the person on the winder who was assigned on the schedule for the remainder of the week and learn what he could, and informed Plaintiff that he would be placed back onto the schedule the following week in the job to which he was assigned.  (Ariganello Trial Dep., ECF No. 151-1 at PageID.3345–46.)

q.  Plaintiff testified that Ariganello told him that he would be working as a Fourth Hand on the winder and that Plaintiff completed an entire shift on the winder.  (Bench Trial Tr., ECF No. 159 at PageID.4536, 4539 (Kelly).)

28. On August 16, 2017, when Plaintiff was working in the capacity assigned by Ariganello, an emergency situation arose, in which the basement of the K-1 Machine became flooded full of stock.  (Bench Trial Tr., ECF No. 158 at PageID.4273 (Fisher); Emails, Pl. Trial Ex. 1 at GPI 14; Bench Trial Tr., ECF No. 162 at PageID.5174–75 (Strey).)

a.  Strey testified that this kind of situation was abnormal, while a former employee of Defendant, Chaz Walls ("Walls") testified that the basement flooded frequently.

14

(Bench Trial Tr., ECF No. 162 at PageID.5174 (Strey); Bench Trial Tr., ECF No. 159 at PageID.4305 (Walls).)

b.  To address the situation, the plant manager called all other departments and instructed that they send any extra personnel in their departments over to K-1 to assist with the cleanup.  (Ariganello Trial Dep., ECF No. 151-1 at PageID.3344.)

c.  Ariganello considered Plaintiff to be an "extra" person and instructed him to go to K-1 to assist with the cleanup.  (*id.* at PageID.3349.)

d.  Plaintiff went to the K-1 Machine, where Lindsey Homister (formerly, Lindsey Fisher, hereinafter, "Fisher") was serving as the supervisor over the K-1 Machine. (Bench Trial Tr., ECF No. 159 at PageID.4544 (Kelly).)

e.  Fisher assigned Plaintiff to the basement to assist with the cleanup.  (Emails, Pl. Trial Ex. 1 at GPI 14.)

f.  Plaintiff questioned why he, as a Fourth Hand, was being requested to assist with cleanup, and Fisher informed him that she had requested any extra assistance, not any particular position.  (*id.*)

g.  While Plaintiff was working on the cleanup, using a hose, Plaintiff started to feel pain shooting through his hand and up his forearm.  (Bench Trial Tr., ECF No. 160 at PageID.4556–57 (Kelly).)

h.  Plaintiff took two breaks within approximately the first hour of performing cleanup work, and, during the second such break, he went to Fisher and reported that the hosing he was doing was not making progress on the cleanup.  (Emails, Pl. Trial Ex. 1 at GPI 14.)

i.  Upon Fisher's further instruction to Plaintiff as to how to address this, Plaintiff reported that the hosing was also causing his thumb to flare up.  (*id.*)

j.  Fisher suggested other jobs, but Plaintiff stated that these would hurt his thumb as well.  (*id.*)

k.  As Plaintiff was not able to perform any of the necessary tasks for the cleanup, Fisher instructed Plaintiff to return to his regular department and speak to his supervisor.  (*id.*)

l.  Fisher documented the incident via e-mail to relevant leadership and HR, consistent with normal, common practice.  (Bench Trial Tr., ECF No. 158 at PageID.4236 (Fisher).)

m.  Fisher told Ariganello that Plaintiff was of no use to her.  (Ariganello Trial Dep., ECF No. 151-1 at PageID.3355.)

n.  Plaintiff informed his union representative, Terry DeHollander ("DeHollander") of the situation, and DeHollander was not happy that Plaintiff had been moved from K-3 to K-1 (Bench Trial Tr., ECF No. 160 at PageID.4560–61 (Kelly).)

o.  Plaintiff returned to K-3 and finished his shift.  (*id.* at PageID.4566.)

29. Following receipt of Fisher's email, HR Manager Strey met with Plaintiff the next day. (Bench Trial Tr., ECF No. 162 at PageID.5309 (Strey).)

a.  Strey had never previously interacted with Plaintiff.  (*id.* at PageID.5143.)

b.  Strey did not have prior knowledge of any details concerning Plaintiff's medical situation beyond that he had been cleared to work without restrictions.  (*id.* at PageID.5307.)

c.  Using a hose is a task that any person in any position at GPI would be expected to do when needed, and using and cleaning hoses is part of everyone's job at the plant, particularly during an emergency situation.  (*id.* at PageID.5177–78.)

d.  The meeting was held between Plaintiff, Strey, Fisher, and another person, and Plaintiff testified that during the meeting, he was told that he could not do his job and that he did not do what was asked of him.  (Bench Trial Tr., ECF No. 160 at PageID.4568 (Kelly).)

e.  Plaintiff replied that hosing the basement was not his job.  (*id.*)

f.  During the meeting, Strey asked Plaintiff about the difficulty he had reported to Fisher.  (Plaintiff's Employment File, Pl. Trial Ex. 5 at GPI 382–86.)

g.  Strey instructed Plaintiff that, given his recent return and his experience of pain performing normal job functions, he would need to go back to his doctor for reassessment of his hand.  (*id.*; Emails, Pl. Trial Ex. 1 at GPI 20.)

h.  Strey considered Plaintiff's injury as non-work-related, as there was no event that happened at work that created his injury.  (Bench Trial Tr., ECF No. 162 at PageID.5184 (Strey).)

i.  Strey's understanding of the injury as non-work-related was based on Plaintiff's implication that while holding the hose, he realized "he may have come back too soon," and that Plaintiff never said or implied that the hose caused his injury.  (*id.* at PageID.5186.)

j.  Strey reported Plaintiff's injury as OSHA non-recordable because it occurred in the work environment but met an exception for symptoms surfacing at work but solely

17

a result of a non-work-related event or exposure that occurred outside of the work environment.  (*id.* at PageID.5184–86.)

  k.  The Union filed a grievance on Plaintiff's behalf regarding this incident, and HR settled the grievance because, according to a union representative, "they pretty much agreed . . . that [Plaintiff] should not have been moved" from K-3 to K-1. (Bench Trial Tr., ECF No. 159 at PageID.4339–40 (Hassiel).)

30.  After evaluating Plaintiff's condition, Plaintiff's doctor wrote him off of work entirely. (Bench Trial Tr., ECF No. 160 at PageID.4786 (Kelly).)

  a.  Plaintiff advised Defendant on August 29, 2017 that he expected to be "out for approximately 2 months," but Plaintiff was scheduled to "check-in" with the HR Department "every two weeks."  (Emails, Pl. Trial Ex. 1 at GPI 21.)

31.  Plaintiff made no effort to assert his rights pursuant to the CBA provisions regarding employees who are removed from a job due to physical disability.  (Bench Trial Tr., ECF No. 161 at PageID.4852, 4842, 4847 (Kelly).)

  a.  Plaintiff states that he did not do so because he believed that the provision did not apply, as he did not consider himself to be disabled in August 2017.  (*id.* at PageID.4852.)

32.  Between August 2017 and August 2019, Plaintiff did not provide updated information with Defendant that would "change his situation in order to be able to review it again and bring him back."  (Bench Trial Tr., ECF No. 162 at PageID.5110 (Strey).)

  a.  There was no instance during that two-year time period in which Plaintiff reported any kind of clearance to return to work, either with or without restrictions.  (*id.* at PageID.5310.)

b. While Plaintiff alleges that Defendant's placement of him back on leave in August 2017 was wrongful, he never caused a grievance to be filed on his behalf, nor did he report any alleged violation under Defendant's policies to HR or the Alertline. (Bench Trial Tr., ECF No. 161 at PageID.4852–53 (Kelly).)

c. Plaintiff claims that he did not report back sooner because it was his understanding that he could not return to work until he received a full release with no restrictions. (Bench Trial Tr., ECF No. 160 at PageID.4791 (Kelly).)

d. Defendant is unaware of and has no record of information regarding a requirement of a full release with no restrictions ever being communicated to Plaintiff, nor does Defendant have any such policy.  (Belice Trial Dep., ECF No. 155 at PageID.3766; Bench Trial Tr., ECF No. 162 at PageID.5116 (Strey).)

33. On August 7, 2019, after almost two years on leave, Plaintiff provided a doctor's note to Defendant's HR Department stating that he could return to "full duty," but not until August 26, 2019.   (Belice Trial Dep., ECF No. 155 at PageID.3763; 7/8/2019 Borgess Work Restriction Form, Def. Trial Ex. E.)

a. Because the return-to-work date was past the two-year leave limitation specified under the CBA, HR was uncertain as to how the situation should be handled. (Belice Trial Dep., ECF No. 155 at PageID.3763; Bench Trial Tr., ECF No. 162 at PageID.5285 (Strey).)

b. Strey sought guidance and received a determination that it was permissible to move ahead with scheduling Plaintiff for a return-to-work physical even though Plaintiff's return date was scheduled for after the two-year deadline.  (Bench Trial Tr., ECF No. 162 at PageID.5285 (Strey).)

19

    c. Strey experienced some delay in this determination because she was involved in significant negotiations with the Union regarding the potential building of a new machine at the facility, a $660 million project.  (*id.* at PageID.5285–87.)

34. On August 27, 2019, Plaintiff's counsel emailed Defendant's HR inquiring about Plaintiff's employment status.  (Bench Trial Tr., ECF No. 160 at PageID.4633 (Kelly).)

    a. Plaintiff's counsel followed up on September 4, 2019.  (*id.* at PageID.4534.)

35. On September 16, 2019, Defendant proceeded to schedule Plaintiff's return-to-work physical.  (Bench Trial Tr., ECF No. 162 at PageID.5290 (Strey); 9/16/2019 Order for Return to Work Physical, Def. Trial Ex. H.)

    a. On September 17, 2019, after the physical had been scheduled but before it was completed, Plaintiff submitted to Defendant updated information from his doctor.  (9/17/2019 Borgess Work Restriction Form, Def. Trial Ex. I; Bench Trial Tr., ECF No. 161 at PageID.4857 (Kelly).)

    b. Contrary to the release that Plaintiff provided on August 7, the updated release placed medical restrictions upon his return to work.  (9/17/2019 Borgess Work Restriction Form, Def. Trial Ex. I; Bench Trial Tr., ECF No. 161 at PageID.4857.)

    c. Those restrictions included no lifting more than 50 pounds with Plaintiff's left hand, no pushing or pulling with his left hand in excess of 50 pounds, and "no repetitive climbing, including ladders or stairs."  (9/17/2019 Borgess Work Restriction Form, Def. Trial Ex. I.)

    d. Also on September 17, 2019, Plaintiff emailed HR, specifically Jennifer Belice ("Belice"), to ensure that Defendant was in receipt of his current restrictions and

requesting information as to what job he would be doing.  (Bench Trial Tr., ECF
No. 162 at PageID.5163 (Strey).)

e.   In response, Belice asked if Plaintiff completed a physical, to which he replied that
he had not, and asked again what job he would be doing upon his return, to which
Belice did not respond.  (*id.*)

f.   Belice provided the updated information and restrictions for review during the
return-to-work physical.  (Belice Trial Dep., ECF No. 155 at PageID.3767.)

g.   The return-to-work physical examination was completed on September 19, 2019,
and the physical confirmed that the restrictions provided in the updated release
needed to be in place for Plaintiff, per his orthopedic surgeon.  (Bench Trial Tr.,
ECF No. 160 at PageID.4676–77 (Kelly); Emails, Pl. Trial Ex. 1 at GPI 56.)

36. On September 19, 2019, Plaintiff informed Belice that he completed the physical and asked
again for information on what job he would be doing, to which Belice responded that she
would provide information once she had clearance.  (Bench Trial Tr., ECF No. 162 at
PageID.5101–02 (Belice); Emails, Plt. Trial Ex. 1 at GPI 67–68.)

37. Black testified about an email he sent on September 24, 2019 to Strey inquiring about
Plaintiff's status.  (Bench Trial Tr., ECF No. 161 at PageID.4978 (Black).)

a.   Black explained that he reached out to Strey at that time because he noticed that
Plaintiff had been on leave for more than two years, which, pursuant to the CBA,
would have triggered his termination.  (*id.*)

b.   During Plaintiff's leave, other employees were being required to work overtime,
which was becoming a burden.  (*id.*)

    c.   Black testified that when writing this email, he had no knowledge of Plaintiff's medical situation or any particular facts concerning his situation.  (*id.* at PageID.4979.)

    d.   Black went on to testify that he had no awareness of Plaintiff ever having made any request for an accommodation of a disability.  (*id.* at PageID.4980.)

    e.   Black further testified that his email was not in any way motivated by a desire to punish Plaintiff.  (*id.* at PageID.4979.)

    f.   In response to Black's email, Strey noted that the situation with Plaintiff was complicated, and that she was "going through the process to make sure we follow ADA requirements," and that she was "proactively pushing to part ways with Plaintiff."  (Emails, Plt. Trial Ex. 1 at GPI 65.)

38. Upon Defendant's receipt and review of the return-to-work physical results, Defendant determined that Plaintiff's specific restrictions, and particularly the restriction against any climbing, including ladders or stairs, would preclude his ability to perform the essential functions of his job or another job in the plant.  (Bench Trial Tr., ECF No. 162 at PageID.5146 (Strey); Simon Trial Dep., ECF No. 154 at PageID.3557–59.)

    a.   As a result, Defendant informed the Union that Plaintiff would not be reinstated at that time but would instead be continued on leave-of-absence status.  (Bench Trial Tr., ECF No. 162 at PageID.5299–5300 (Strey).)

    b.   Although Plaintiff had not returned to work so as to entitle him to a new two-year allotment of leave, Defendant gave him an additional two years due to the delay in scheduling his return-to-work physical.  (*id.* at PageID.5298–99.)

    c.  Defendant reasoned that if the return-to-work physical had not been delayed, Plaintiff may have been able to return to work at some point between August 26, 2019 and September 17, 2019, at which time Plaintiff's own doctor had issued restrictions for him.  (*id.*)

    d.  Strey was attempting to give Plaintiff the "benefit of the doubt" by making a new maximum leave period available to him in case her delay had prevented him from returning, even for a temporary period that would have allowed him a new leave period.  (*id.*)

    e.  The only option other than extending Plaintiff's leave for an additional two years was to terminate Plaintiff's employment.  (*id.* at PageID.5299.)

39. On October 1, 2019, Plaintiff emailed Belice again asking for updates, and Belice forwarded Plaintiff's email to Strey that day and asked Strey if there were any updates on Plaintiff's status.  (Emails, Plt. Trial Ex. 1 at GPI 67.)

40. Plaintiff has not sought or received any change in his medical restrictions since September 2019.  (Bench Trial Tr., ECF No. 161 at PageID.4859–60 (Kelly).)

41. At no time following the second leave extension did Plaintiff ever report that his medical situation had changed.  (Belice Trial Dep., ECF No. 155 at PageID.3769.)

42. The second two-year leave period expired in September 2021, but Defendant still did not terminate Plaintiff's employment, as he had recently filed the instant lawsuit, and Strey did not wish to take any action that could be construed as retaliatory.  (Bench Trial Tr., ECF No. 162 at PageID.5337–38 (Strey).)

a.  Plaintiff remains an employee of Defendant and his seniority continues to be intact.
(Bench Trial Tr., ECF No. 160 at PageID.4696 (Kelly); Simon Trial Dep., ECF No.
154 at PageID.3522.)

### G.  **Plaintiff's Job Search Efforts**

43. During the period between September 2019 and February 2021, Plaintiff was involved in
running a women's professional basketball team, the Grand Rapids Galaxy, and a women's
basketball league, the Women's Basketball Development Association ("WBDA").
(Articles & Website Documentation GR Galaxy & WBDA, Def. Trial Exs. AA & BB;
Bench Trial Tr., ECF No. 161 at PageID.4894–95, 4901–04, 4905–4910 (Kelly).)

a.  Plaintiff created the Grand Rapids Galaxy basketball team during the 2015–2016
timeframe.  (LARA Documentation Grand Rapids Galaxy, Def. Trial Ex. Y; Bench
Trial Tr., ECF No. 161 at PageID.4895.)

b.  Plaintiff acquired the WBDA in 2018.  (LARA Documentation WBDA, Def. Trial
Ex. Z; Bench Trial Tr., ECF No. 161 at PageID.4893, 4896–97.)

c.  Plaintiff hoped to earn income from the Grand Rapids Galaxy and WBDA but he
has never done so.  (Bench Trial Tr., ECF No. 161 at PageID.4893.)

d.  Neither business has produced a profit.  (*id.* at PageID.4894.)

44. Plaintiff collected enhanced pandemic unemployment benefits in 2020.  (Plaintiff's Tax
Forms, Pl. Trial Ex. 7.)

a.  The enhanced benefit was approximately $600 per week.  (Bench Trial Tr., ECF
No. 161 at PageID.4889.)

45. Plaintiff also received $16,880 of pandemic-related unemployment benefits in 2021. (Plaintiff's Tax Returns, Def. Trial Ex. V; Bench Trial Tr., ECF No. 161 at PageID.4892 (Kelly).)

46. Plaintiff was able to qualify for unemployment benefits under his WBDA entity, for which he is the sole member and "CEO," despite the entity never having generated any income. (Bench Trial Tr., ECF No. 161 at PageID.4892.)

47. In July 2020, Plaintiff left Michigan and moved to Tennessee.  (Bench Trial Tr., ECF No. 160 at PageID.4639–40.)

48. After moving to Tennessee, Plaintiff applied for two jobs, which were the only jobs he had sought since 2017.  (Bench Trial Tr., ECF No. 161 at PageID.4878–79, 4911 (Kelly).)

    a. The first was in February 2021, when Plaintiff submitted an employment application to Benchmarks Physical Therapy in Knoxville, Tennessee.  (*id.* at PageID.4878.)

    b. The second was in March 2021, when Plaintiff applied for and received a position as General Manager of Three Rivers Market ("Three Rivers") in Knoxville, Tennessee.  (*id.* at PageID.4911.)

49. Plaintiff's position at Three Rivers was full time, at 40 scheduled hours per week, beginning March 30, 2021.  (*id.*)

    a. The position provided health, dental, and vision insurance as well as retirement plan benefits.  (*id.* at PageID.4916.)

    b. Plaintiff's initial pay rate was $24.44 per hour, but then increased to $27.15 after a 90-day trial period.  (*id.* at PageID.4912.)

25

50. Three Rivers terminated Plaintiff's employment on or about December 27, 2021, due to his violation of company policies.  (*id.*)

    a.  Plaintiff's employment was terminated after he failed to call in or report absences for three weeks in a five-week time period.  (*id.* at PageID.4916–17.)

51. Since December 2021, Plaintiff has not engaged in any meaningful job search efforts. (*id.* at PageID.4882–4884.)

    a.  Plaintiff's total job search efforts consist of sending about five job applications overall.  (*id.* at PageID.4883.)

    b.  Plaintiff cannot recall the companies to which he applied or the lines of work in which he sought to be employed.  (*id.*)

    c.  Plaintiff never contacted any public or private employment agency or placement service to try and find work.  (Plt. Responses to Dft. Interrogatories, Def. Trial Ex. S.)

## II.    CONCLUSIONS OF LAW

### A.  Legal Standard

#### 1.  <u>Burden</u>

At summary judgment, retaliation claims under the ADA are analyzed under the burden-shifting approach developed for Title VII cases in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1972).  *Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014).  Under this framework, if a plaintiff can establish a prima facie case of retaliation, the burden of production shifts to the defendant to offer legitimate, non-retaliatory reasons for its actions.  *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009).  If the defendant does so, the burden shifts back to the plaintiff "to show that the proffered reasons were not the true reasons for the employment decision, i.e., that

the reasons were a pretext for retaliation." *Hubbell v. FedEx SmartPost, Inc.*, 933 F.3d 558, 568 (6th Cir. 2019).

The Sixth Circuit has addressed the role of the *McDonnell Douglas* framework in a bench trial. *See Bilski v. McCarthy*, 790 F. App'x 756, 761–62 (6th Cir. 2019).  In doing so, the Sixth Circuit has observed that the trier of fact (in a bench trial, the trial judge) "should not . . . revisit[ ] whether [the plaintiff] established a prima facie case . . . ." *Id.* at 762.  The Court's "duty at this stage of the proceedings is therefore to determine the ultimate question": whether Plaintiff has produced sufficient evidence to support a finding that Defendant retaliated against him for exercising his rights under the ADA.  *Imwalle v. Reliance Med. Prod., Inc.*, 515 F.3d 531, 546 (6th Cir. 2008).  To win a judgment, a plaintiff is required to overcome the additional obstacle of the defendant's anticipated rebuttal and convincingly demonstrate the existence of retaliation.  *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861.  "At [this] stage, he not only must present facts and evidence allowing inferences to be drawn in his favor, but also must present a case that allows those inferences to be of significant force as to overcome the defendant's rebuttal or prove the rebuttal pretext." *Id.*

## 2. **Retaliation**

As summarized by the Sixth Circuit, the ADA provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." *Rorrer*, 743 F.3d at 1046 (quoting 42 U.S.C. § 12203(a)).  To establish a case of retaliation under the ADA, a plaintiff must prove by a preponderance of the evidence that: "(1) the plaintiff engaged in activity protected under the ADA; (2) the employer knew of that activity; (3) the employer took an adverse action

against plaintiff; and (4) there was a causal connection between the protected activity and the adverse action." *Id.* (citing *A.C. ex rel. J.C. v. Shelby Cnty. Bd. of Educ.*, 711 F.3d 687, 697 (6th Cir. 2013)).

### 3. __Interference__

The ADA provides that "it shall be unlawful to ... interfere with any individual in the exercise or enjoyment of . . . any right granted or protected by this chapter." 42 U.S.C. § 12203(b). "While the Sixth Circuit has recognized that 'a plaintiff can assert a claim of interference with employment-related rights under § 12203(b) only against an employer,' the circuit has not confirmed the elements of the claim." *Willis v. CSL Mgmt. L.L.C.*, No. 2:21-CV-10805, 2023 WL 4355031, at *6 (E.D. Mich. July 5, 2023), *appeal dismissed sub nom. Willis v. CSL Mgmt. LLC*, No. 23-1818, 2023 WL 8614049 (6th Cir. Nov. 20, 2023). Some courts "have treated § 12203(b) as essentially a second anti-retaliation provision, though perhaps a broader one." *Post v. Trinity Health-Michigan*, No. 18-CV-13773, 2021 WL 3269058, at *4 (E.D. Mich. July 30, 2021), *aff'd sub nom. Post v. Trinity Health-Michigan*, 44 F.4th 572 (6th Cir. 2022) (citations omitted). However, other courts have applied "a four-part test akin to the test applied in the context of the Fair Housing Act's anti-interference provision." *Id.* Under that test, a plaintiff must show that the defendant "coerced, threatened, intimidated, or interfered on account of [his or] her protected activity." *Willis*, 2023 WL 4355031, at *6 (quoting *Frakes v. Peoria Sch. Dist. No. 150*, 872 F.3d 545, 550–51 (7th Cir. 2017)). Some courts within the Sixth Circuit have distinguished interference claims from retaliation claims under the ADA by identifying a requirement of "discriminatory animus" for interference claims. *See, e.g.*, *Hazen v. Cleveland Clinic Found.*, No. 1:21-CV-01965, 2022 WL 3083027, at *10 (N.D. Ohio July 29, 2022).

### B.  Analysis

#### 1.  Retaliation

*Protected Activity.*  "Protected activity typically refers to action taken to protest or oppose a statutorily prohibited discrimination." *Rorrer*, 743 F.3d at 1046.  The Sixth Circuit has held that "requests for accommodation are protected acts" for purposes of a retaliation claim under the ADA.  *Shelby Cnty. Bd. of Educ.*, 711 F.3d at 698; *Hurtt v. Int'l Servs., Inc.*, 627 F. App'x 414, 422 (6th Cir. 2015); *see also Reeder v. Cnty. of Wayne*, 177 F. Supp. 3d 1059, 1081 (E.D. Mich. 2016) ("A plaintiff does not need to show that he or she is 'disabled' within the meaning of the ADA to prevail on a disability-retaliation claim. Instead, a plaintiff need only show that he or she engaged in an activity protected by the ADA, such as requesting reasonable accommodations.") (citations omitted).  The "pertinent inquiry" of the protected-activity element is "not whether [the plaintiff] proved he had a disability under the ADA, or whether [the defendant] had specific knowledge of [the plaintiff's] alleged disability, but rather, whether [the plaintiff] showed a good-faith request for reasonable accommodations." *Hurtt*, 627 F. App'x at 423.

The evidence elicited at trial demonstrates that Plaintiff engaged in protected activity.  On September 17, 2019, after previously indicating that he could return to work without restrictions, Plaintiff provided updated information from his doctor that placed work restrictions on Plaintiff, including restrictions against lifting more than 50 pounds with his left hand, pushing or pulling with his left hand in excess of 50 pounds, and repetitive climbing, including ladders or stairs (9/17/2019 Borgess Work Restriction Form, Def. Trial Ex. I; Bench Trial Tr., ECF No. 161 at PageID.4857).  Although none of the evidence presented at trial demonstrates Plaintiff requesting a reasonable accommodation given these restrictions, Plaintiff's multiple emails to Belice requesting information as to what job he would be doing in light of the restrictions can be construed

as requests for accommodation (Bench Trial Tr., ECF No. 162 at PageID.5163 (Strey); Bench Trial Tr., ECF No. 162 at PageID.5101–02 (Belice); Emails, Pl. Trial Ex. 1 at GPI 67–68). The evidence does not show Plaintiff as having suggested a specific, reasonable accommodation to his restrictions or having requested anything other than information about his return to work. However, in light of the generous standard for protected activity under the ADA, the Court concludes that Plaintiff's submission of work restrictions and requests for reinstatement and for Defendant to tell him what job he would be doing implies a good faith request for a reasonable accommodation. Accordingly, Plaintiff was engaged in protected activity under the ADA when he requested to return to work and provided to Defendant updated restrictions from his doctor.[2]

***Adverse Employment Action.*** An adverse employment action is "a materially adverse change in the terms and conditions of a plaintiff's employment." *Spees v. James Marine, Inc.*, 617 F.3d 380, 391 (6th Cir. 2010). Materially adverse employment actions include "a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 461–

---

[2] The Court notes that nowhere in Plaintiff's revised proposed findings of fact and conclusions of law does Plaintiff propose any conclusion with respect to the 'protected activity' element of ADA retaliation (*see* ECF No. 165). In the version of Plaintiff's proposed findings of fact and conclusions of law submitted to the Court before trial (ECF No. 117 at PageID.2727), Plaintiff proposed the conclusion that he engaged in protected activity by asking Fisher in 2017 if it was acceptable for him to take breaks because of his hand injury's irritation from use of the industrial hose during the cleanup of the flood on K-1. Because this case concerns Plaintiff's attempt to return to work in 2019, Plaintiff's interaction with Fisher in 2017 cannot constitute protected activity in the case at bar. In Plaintiff's pretrial proposed findings of fact and conclusions of law, Plaintiff also mentions his counsel's email to Defendant in 2019 asking for the status of his employment and Plaintiff's 2019 email exchange with Defendant regarding the updated restriction form and what job Plaintiff would be doing upon his return to work (*id.* at PageID.2727–28). However, Plaintiff does not specifically propose a conclusion that these were protected activities (*id.*).

62 (6th Cir. 2000) (quotations omitted).  De minimis employment actions are not materially adverse and are accordingly not actionable.  *Id.* at 462; *see, e.g.*, *Novotny v. Elsevier*, 291 F. App'x 698, 703 (6th Cir. 2008) (affirming the district court's finding that allegations that plaintiff's calendar was closely scrutinized, that she was left off of out-of-office emails, that she was referred to executive coaching, that she was pushed for inputs on her development plan, and that she was placed on a corrective action plan were insufficient to show that she suffered an adverse employment action); *Monak v. Ford Motor Co.*, 95 F. App'x 758 (6th Cir. 2004) (holding that the plaintiff's claims that she was not permitted to return to the same shift and job she had before going on medical leave, and that she was screamed at, unfairly criticized, and treated rudely by several supervisors, did not amount to an adverse employment action).

"The Sixth Circuit has not directly addressed the issue of whether unpaid medical leave is an adverse employment action."  *Squiers v. Washtenaw Cnty.*, No. 21-11956, 2023 WL 3506422, at *4 (E.D. Mich. May 17, 2023) (holding that plaintiff's ADA retaliation claim failed because placement on unpaid medical leave did not amount to adverse employment action), *recon. denied*, No. 21-11956, 2023 WL 4565463 (E.D. Mich. July 17, 2023).  In *Baker v. Windsor Republic Doors*, 414 F. App'x 764 (6th Cir. 2011), the Sixth Circuit stated that placing an employee on forced unpaid leave could be an adverse employment action rather than a reasonable accommodation under the ADA.  In that case, the employee's involuntary medical leave meant that he was paid no salary, received no benefits, and had no work responsibilities.  *Id.* at 766.  At the summary judgment stage, the Sixth Circuit observed that a reasonable jury could consider the imposition of unpaid medical leave to constitute an adverse employment action; however, the Court noted that the employee did not seek accommodation for a temporarily disabling condition

through medical leave, but instead sought to return to work by employing corrective measures to compensate for a more permanent condition.  *Id.* at 772–73.

Other circuits have held that placing an employee on unpaid leave is not considered an adverse employment action.  *See Clark v. Charter Commc'ns L.L.C.*, 775 F. App'x 765, 767 (5th Cir. 2019) (rejecting the plaintiff's argument that she suffered an adverse action because she was forced to take unpaid leave during which she lost insurance benefits and access to healthcare); *Freelain v. Vill. of Oak Park*, 888 F.3d 895, 901 (7th Cir. 2018) (stating that "granting an employee's FMLA rights to unpaid leave consistent with the statute's explicit terms cannot constitute a retaliatory adverse action under the FMLA itself or under the ADA, at least without evidence that [the] employer deviated from its normal paid leave practices and targeted him for unpaid leave because he asserted his statutory rights.").

The evidence in this case presents a close question as to whether Plaintiff has sufficiently demonstrated that Defendant took an adverse employment action against him.   The sole employment action at issue is Defendant's decision to place Plaintiff on an additional two-year unpaid medical leave after Plaintiff provided updated restrictions and underwent a return-to-work physical examination, and Defendant determined that Plaintiff's restrictions would preclude his ability to perform the essential functions of his job or another job in the plant (Bench Trial Tr., ECF No. 162 at PageID.5146 (Strey); Simon Trial Dep., ECF No. 154 at PageID.3557–59). Assuming that placing an employee on unpaid leave can constitute adverse employment action, *see Baker*, 414 F. App'x at 764, the circumstances of this case are factually distinct from that of a one-off forced imposition of unpaid medical leave by an employer.

First, Plaintiff received restrictions precluding his ability to climb ladders or stairs, and all or nearly all of the bargaining unit roles in the Mill required stairs, ladders, and/or climbing as a

32

necessary job function (Simon Trial Dep., ECF No. 154 at PageID.3559, 3609–610). Second, Plaintiff was attempting to return from a previous medical leave of almost or over two years, so granting additional leave would constitute a continuation of the status quo rather than a material change in Plaintiff's employment. Finally, evidence at trial demonstrated that by placing Plaintiff on unpaid medical leave, Defendant believed that it was giving Plaintiff the benefit of the doubt about the timing of his return-to-work, rather than terminating Plaintiff's employment, as it believed may have been its right under the CBA (Bench Trial Tr., ECF No. 162 at PageID.5298–99 (Strey)). It is unclear whether Defendant's denial of Plaintiff's reinstatement and placement on unpaid leave under the circumstances constitute employment action that is sufficiently adverse. However, the Court need not resolve this issue because Plaintiff's protected conduct in requesting to return to work with accommodations was not the cause of Defendant placing him on an additional term of unpaid medical leave in 2019.[3]

*Causation.* The Sixth Circuit applies a "but-for" standard for causation, meaning that Plaintiff must show by a preponderance of the evidence that the adverse employment action would not have occurred in the absence of protected activity. *EEOC v. Ford Motor Co.*, 782 F.3d 753, 767 (6th Cir. 2015) (citing *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)).

---

[3] As with the 'protected activity' element, Plaintiff's revised proposed findings of fact and conclusions of law also do not contain any proposed conclusion with respect to the 'adverse employment' element of ADA retaliation (*see* ECF No. 165). Plaintiff's pretrial filing proposed the conclusion that Defendant took three adverse actions against Plaintiff: (1) when "Plaintiff's supervisor had Christine Dowdy, an intern for the mill, act as an overseer and harass Plaintiff" in 2017; (2) when Plaintiff's supervisors exchanged emails discussing his performance in 2017 following the K-1 basement flood; and (3) when Defendant sent an email on September 24, 2019 stating "I am proactively pushing to part ways if it is appropriate and supported" (ECF No. 117 at PageID.2728–29). The first two purported actions took place in 2017, and thus could not constitute adverse employment action in response to Plaintiff's 2019 attempt to return to work. As to the September 24, 2019 email, the transmittal or existence of an internal email does not constitute adverse employment action, as it does not amount to a "materially adverse change in the terms and conditions" of Plaintiff's employment. *Spees*, 617 F.3d at 391.

Causation may be inferred from circumstantial evidence, such as the proximity in time between the protected action and the allegedly retaliatory employment decision. *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008). Temporal proximity alone is rarely enough to satisfy the causal element. *Nguyen v. City of Cleveland*, 229 F.3d 559, 563–66 (6th Cir. 2000); *see also Mickey*, 516 F.3d at 525 ("Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation. But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality.").

Plaintiff's protected conduct of requesting to return to work with accommodations was not the "but-for" cause of Defendant placing him on medical leave and denying his reinstatement, the purported adverse employment action. The evidence elicited at trial—both documentary and testimonial—demonstrates that Defendant placed Plaintiff on medical leave because his particular work restrictions prevented him from engaging in essential job functions, not because of the fact itself that Plaintiff attempted to return to work with restrictions.

Plaintiff must prove that Defendant's proffered explanation for placing him on leave and denying his return-to-work request is false, and that the retaliation was the real reason for an adverse employment action. *Burdine*, 450 U.S. at 253. The Sixth Circuit has adopted the "honest belief rule" in determining whether an employer has provided a legitimate, nondiscriminatory reason for the adverse action. *See Donald v. Sybra, Inc.*, 667 F.3d 757, 763 (6th Cir. 2012). "The key inquiry in assessing whether an employer holds such an honest belief is 'whether the employer made a reasonably informed and considered decision before taking' the complained-of action."

*Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 598–99 (6th Cir. 2007) (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998)).  An employer's decision should show that the employer "reasonably relied on the particularized facts that were before it at the time the decision was made."  *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001).  The employer's decisional process is not required to be "optimal or that [the employer] left no stone unturned."  *Smith*, 155 F.3d at 807.

The Court concludes that Defendant's reason for placing Plaintiff on leave and denying his return-to-work request is a legitimate, nondiscriminatory reason.  Evidence elicited at trial demonstrates that Defendant was arranging for Plaintiff's return to work with no restrictions until Plaintiff provided an updated work restriction form, which Defendant provided for the September 2019 return-to-work physical examination (Belice Trial Dep., ECF No. 155 at PageID.3767).  Strey considered how to handle the situation with Plaintiff, given that his intended return-to-work date was outside of the two-year period, which she believed applied under the CBA, and ultimately decided to process Plaintiff's return-to-work (Belice Trial Dep., ECF No. 155 at PageID.3763; Bench Trial Tr., ECF No. 162 at PageID.5285 (Strey)).

The updated form included restrictions of "no climbing, including ladders or stairs," (9/17/2019 Borgess Work Restriction Form, Def. Trial Ex. I), and the return-to-work physical examination confirmed that the restrictions provided in the updated release needed to be in place for Plaintiff, per his orthopedic surgeon (Bench Trial Tr., ECF No. 160 at PageID.4676–77; Emails, Pl. Trial Ex. 1 at GPI 56).  Evidence at trial demonstrates that Defendant reviewed the return-to-work physical results and determined that Plaintiff's restrictions, in particular the restriction on climbing, would prevent Plaintiff from performing essential functions of his job or any other at the plant (Bench Trial Tr., ECF No. 162 at PageID.5146 (Strey); Simon Trial Dep.,

ECF No. 154 at PageID.3557–59).  The evidence further demonstrates that Defendant believed the only option other than extending Plaintiff's leave of absence would be to terminate Plaintiff's employment, and that Defendant chose the less severe of the two courses of action (Bench Trial Tr., ECF No. 162 at PageID.5299 (Strey)).  Plaintiff has not presented any evidence that the decision to put Plaintiff on medical leave was in any way related to the exercise of his rights under the ADA by requesting an accommodation, let alone that the decision was retaliatory.  To conclude otherwise would be to discount Plaintiff's evidentiary burden and ignore the evidence that Defendant renewed Plaintiff's medical leave, rather than terminate him, after updated information provided by Plaintiff from his doctor and the return-to-work physical resulted in a restriction on climbing, which virtually every job at the plant required (Simon Trial Dep., ECF No. 154 at PageID.3558, 3609–10).

When a defendant demonstrates a legitimate business reason for its action, Plaintiff has an opportunity to show that Defendant's reason is pretextual.  Pretext can be demonstrated "by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003).

Plaintiff presented no evidence demonstrating that Defendant's stated reason for putting Plaintiff on unpaid leave—that he was unable to perform essential job functions—was pretextual, and Plaintiff made no such argument at trial.  Indeed, if Plaintiff were to have made an argument that Defendant's reason for placing Plaintiff on another two-year unpaid medical leave was pretextual, it is unclear upon what evidence he would rely.  To the extent that Plaintiff could construe the email between Strey and Black indicating Strey's desire to proactively part ways with Plaintiff (Emails, Pl. Trial Ex. 1 at GPI 65) as demonstrating pretext, that evidence alone would

not satisfy Plaintiff's burden.  That email is especially weak evidence of pretext or any kind of animus given Black's testimony that his desire to resolve Plaintiff's employment status emerged from his desire to lessen the burden on other employees who had been required to work overtime to keep Plaintiff's position open while Plaintiff was on leave for two years (Bench Trial Tr., ECF No. 161 at PageID.4978 (Black)).  Accordingly, the Court concludes that Defendant placed Plaintiff on unpaid medical leave because of its determination that Plaintiff was unable to perform essential job functions, based on the documentation and results of his return-to-work physical examination.  In other words, the fact of Plaintiff's request to return to work with accommodation, assuming he indeed so requested, was not the "but-for" cause of his renewed leave, and none of the evidence at trial indicated Defendant as having retaliated against Plaintiff.

In sum, while Plaintiff engaged in protected activity, Plaintiff has not demonstrated by a preponderance of the evidence that an adverse employment action was taken against him in retaliation for that protected activity under the ADA.  Plaintiff has, therefore, failed to prove his ADA retaliation claim.[4]

## 2. **Interference**

To establish protected activity under ADA § 12203(b), a plaintiff must show that he "exercised or enjoyed" a right granted or protected by the ADA or "aided or encouraged" another individual in the "exercise or enjoyment of" such rights.  42 U.S.C. § 12203(b).  "Logic dictates that an interference claim cannot lie if the allegedly interfering action lacks any connection to the

---

[4] As with the other elements of ADA retaliation, Plaintiff has also failed to provide proposed conclusions of law as to the causal connection element (*see* ECF No. 165).  Plaintiff's pretrial submission summarily states that a causal connection exists between protected activity and adverse employment action because after Plaintiff attempted to return to work, Defendant kept Plaintiff on unpaid leave "instead of either finding Plaintiff a position or terminating Plaintiff," and once Plaintiff asked for an accommodation, "Defendant decide [*sic*] not to accommodate Defendant [*sic*] because it already had its mind to 'part ways' with Plaintiff" (ECF No. 117 at PageID.2729).

protected activity.  Thus, a causation analysis similar to that of a retaliation claim is required."
*Willis*, 2023 WL 4355031, at *6.

Having found that Plaintiff's claim for ADA retaliation fails on the causal connection requirement, and with Plaintiff failing to provide sufficient evidence of discriminatory animus, coercion, threats, or intimidation, the Court finds that Plaintiff's claim for ADA interference fails under any test interpreting § 12203(b).  *See Youngblood v. Prudential Ins. Co.*, 706 F. Supp. 2d 831, 840 (M.D. Tenn. 2010) (guiding the analysis of an ADA interference claim "by the interpretation of the identical anti-interference provision of the FHA" and finding that for the defendants' actions "to rise to the level of actionable interference with plaintiff's ADA-protected rights pursuant to § 12203(b), those actions must have been taken because of plaintiff's alleged disability").

In sum, for the foregoing reasons, Plaintiff failed to show by a preponderance of the evidence that Defendant retaliated against him or interfered with his rights in violation of the ADA, and the Court does not reach the issue of damages.  Because this Opinion resolves the last remaining claim, pursuant to Federal Rules of Civil Procedure 52(a)(1) and 58, a Judgment in favor of Defendant and against Plaintiff consistent with this Opinion will issue.

Dated:  April 3, 2024                                    /s/ Jane M. Beckering
                                                                  JANE M. BECKERING
                                                                  United States District Judge